UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ALICIA BOUDOURIS,

                     Plaintiff,                          **COMPLAINT**

      -against-

                                                Jury Trial Demanded

THE COUNTY OF NASSAU, and MICHAEL
SPOSATO, LAWRENCE SCHNURR, LOU CAFIERO,
DAN SYDOR, in their official and individual capacities,

                    Defendants.
-------------------------------------------------------------------X

      Plaintiff, Alicia Boudouris, by and through her attorneys, LEEDS BROWN LAW, P.C.,

alleges upon knowledge as to herself and her own actions, and upon information and belief as to

all other matters, as follows:

### JURISDICTION AND VENUE

      1.      This is a civil action based on Defendants' violations of Plaintiff's rights as

guaranteed to her by the Fourteenth Amendment of the United States Constitution, as enforced

by 42 U.S.C. § 1983 ("Section 1983"), and Defendants Sposato, Schnurr, Cafiero, and Sydor's

violations of the New York State Human Rights Law, and any other cause of action which can be

inferred from the facts set forth herein.   Plaintiff has simultaneously filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC") and intends to

amend this complaint to include Title VII claims upon receipt of a right to sue letter.

      2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343.

Supplemental jurisdiction is invoked over State causes of action pursuant to 28 U.S.C. § 1367.

3.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

4.      Plaintiff, Alicia Boudouris, a female born in 1964, was and still is a resident of the County of Nassau, State of New York.

5.      Defendant, County of Nassau ("County"), was and still is a municipal corporation organized under the laws of the State of New York and located in Nassau County, New York, which operates and controls the Nassau County Sheriff's Department ("Department").

6.      Michael Sposato was and still is a Sheriff for the Department.  Sposato works in Nassau County, New York.   As the Sheriff, Sposato has final authority to assign work responsibilities, bring disciplinary charges, transfer employees, and set policies.  Accordingly, he is a supervisor under the applicable laws.  Further, he is an employer under the applicable State Laws.  Sposato was generally aware of and remained deliberately indifferent to the unlawful conduct as set forth herein.

7.      Lawrence Schnurr was a Captain, and in or about September 2012 was promoted to Deputy Undersheriff, for the Department.  Schnurr works in Nassau County, New York.  As both a Captain and Deputy Undersheriff, Schnurr has the authority to assign work to Boudouris, issue certain discipline, and to recommend more serious discipline or transfer.  Accordingly, he is a supervisor under the applicable laws.  Schnurr was aware of and remained deliberately indifferent to much of the unlawful conduct as set forth herein.

8.      Lou Cafiero was and still is a Lieutenant of the Department and works in Nassau County, New York.  As a Lieutenant, Cafiero was Boudouris' tour commander and had the authority to assign work to Boudouris, to create employee scheduling, and issue certain discipline or cause disciplinary charges to be instituted via recommendation.  Accordingly, he is a supervisor under the applicable laws.  Cafiero actually participated in the unlawful conduct as set forth herein.

9.      Dan Sydor was a Deputy Sheriff, and in September 2012 was promoted to Sergeant, for the Department.  Sydor works in Nassau County, New York.  As a Sergeant, Sydor has the authority to assign work responsibilities to Boudouris, to discipline her, and to recommend her for more serious discipline or transfer. Accordingly, he is a supervisor under the applicable laws.  Sydor actually participated in the unlawful conduct as set forth herein.

## FACTS

Boudouris Commenced Employment at the Department

10.     In June 2010, the Department hired Boudouris as a Deputy Sheriff.

11.     From June 2010 through January 2011, Boudouris trained at the Suffolk County Police Academy (the "Academy").[1]

12.     Throughout her employment, Boudouris performed in an exemplary manner and was qualified for her job, as shown by, *inter alia*, her meeting the requirements of the Academy and her graduation therefrom, and her receipt of high marks on performance evaluations.

13.     While at the Academy, Deputy Goropeuschek acted as liaison between the Department and the Academy.  Goropeuschek told personnel at the Department's Family Court Unit (the "Unit") that Boudouris would be assigned there upon her graduation from the Academy.

14.     While Boudouris was in the Academy, then-Deputy Sydor told others in the Unit, on multiple occasions, that it was a disgrace the Department hired a 45 year old female, referring to Boudouris.  Deputies Goropeuschek, Dan Feiola, and Joe Pratt told Boudouris about the comments.

---

[1] The Nassau County Police Academy was not holding classes then, so Nassau police agency recruits were trained at the Suffolk County Police Academy.

15.     As reported by Goropeuschek, Feiola, and Pratt, during her training at the Academy Sydor referred to her as "Old mother hubbard," "Old hag," and "Old bag."[2]

<u>The Unit – Generally</u>

16.     The Unit is located in the basement of the Nassau County Family Courthouse.

17.     The Unit's office contained an open space ("Main Area") in which there were approximately 10-12 desks for the deputy sheriffs and other workers.   Two offices were connected to the main area – one office was used by Captain Schnurr (who later became Deputy Undersheriff) and the other office was shared by two Lieutenants – Lieutenant Cafiero and Thomas Sellitto.

18.     Captain Schnurr was the commanding officer of the Unit.   He worked during the day tour (8:00 a.m.-4:00 p.m.).

19.     When Schnurr was not on duty, the working Lieutenant was the highest ranking officer of the Unit.

20.     It was rare, if ever, that supervisors ranked higher than Schnurr ever visited the Unit.

_____

[2] These references and reports of same continued after Boudouris commenced employment in the Unit and Sydor later admitted that he called her these names.

5

21.     Thus, at all times, Schnurr or a Lieutenant was the commanding officer at the Unit and responsible for all that occurred within the Unit, including the responsibility of ensuring that the Unit remained free from sexual harassment.

Boudouris Commences Employment at the Unit

22.     In January 2011, Boudouris was assigned to the Unit.

23.     She was assigned rotating tours, meaning that every other week, she worked the day tour, while working the night tour on the intervening weeks.  Cafiero worked the same tours as Boudouris, was generally her tour commander, and was the highest ranking member of the Unit on the night tours on which he worked.

24.     At the time she started working for the Unit, Boudouris was employed as a probationary employee, meaning she was not entitled to the protections provided by her Union's Collective Bargaining Agreement ("CBA") or by Civil Service Law § 75, and could be terminated for any lawful reason.

25.     On an almost daily basis, Cafiero would stand in a public area of the office and make offensive gender-based comments.  This conduct was widely known throughout the Unit, and was commonly referred to as the "Lou Show."  Boudouris heard the comments, was offended by them, and did not welcome Cafiero making the comments.  Some examples of the comments include, but are not limited to, the following:

a. Cafiero would ask whether female Sergeant Derner "has a hairy chach," (referring her to pubic area), if her "pubes are gray" (referring to her pubic hair), and if her "pubes are straggly like the hair on her head."

b. Cafiero commented about female clerk Diane Mastropaolo stating, "do you think her twat smells as bad as her breath," "does she date Fish [Mastropaola's boyfriend] as an excuse to why her twat smells" and "the thought of her twat makes me want to vomit."

c. Cafiero, while the television was on, one time asked, "Do women even douche anymore?" He was referring to the fact that there had not been commercials about the feminine product recently.

d. During a discussion of a female American Idol contestant who had changed the color of her hair, Cafiero remarked, "Now we don't know if the drapes match the carpet."

e. In reference to Deputy Rockwood (male) and Deputy Stemmle (female), Cafiero, on more than one occasion, said, "I think Stemmle puts on a strap-on and does Rockwood." Cafiero often questioned Stemmle's sexual orientation.

f. While Rosie O'Donnell was on the television, Cafiero remarked, "She's a disgusting pig, her and that other carpet muncher, [Ellen] DeGeneres."

g. Cafiero would make sexual references to Sergeant Derner when she frequently mentioned what she would be making for dinner that night. Derner would not understand the references. For instance, Cafiero asked Derner whether her husband "enjoys the rotisserie" and whether she "was into the rotisserie as well." Derner, thinking Cafiero was referencing chicken, said she enjoyed the food and Cafiero responded, "Oh, I didn't think you'd be into rotisserie." Cafiero was using "rotisserie" as a slang reference to a sexual position. On one occasion, Cafiero said to Derner, "Oh, your husband likes his salad tossed," and asked whether Derner's husband "enjoyed tea bagging," both references to sex acts.

h. Cafiero, in reference to Deputy Stemmle, would state words to the effect of "is it me, or is her ass getting any wider?" Cafiero regularly made similar comments.

i. While watching the news, which depicted a female reporter doing a segment on whales, Cafiero stated words to the effect that a whale was blowing its load because it was attracted to the female reporter, or maybe that it was just a sperm whale.

7

26.     The above examples represent a small sample size of the gender-based discussions/comments.  Such discussions/comments and/or ones of a similar nature occurred on a near daily basis throughout the time Boudouris worked in the Unit and beyond.

27.     Other Unit members and anyone in the room would hear these comments.  Deputy Sydor would commonly join in, making similar comments, including, but not limited to, the following:

a.  He answered Cafiero's rhetorical questions, stating things to the effect of, "that cunt is a filthy pig" or "I don't think that cunt even showers every day."

b.  Called Jennifer Lopez a "disgusting spic" and that she only "does" GAS (an acronym created by Sydor, meaning "greasy ass spic," according to Sydor) and "schmopes" (a term they used to reference a black man).

c.  Referred to Lindsay Lohan and her mother as "skanks" and "drunken whores."

d.  After speaking with his wife, remarked that he hoped she got raped by GAS at the Broadway Mall.  He added that the mall is full of GAS and sand.

e.  When a female clerk that delivered the mail, whom Sydor found unattractive, entered the Unit, he often played the song, "Who Let the Dogs Out," clearly referring to the clerk as a dog.  He made other dog references about the mail clerk as well.

f.  After hearing a hypothetical on the radio about what would be worse, having your teenage daughter impregnated by a Black man or your son being gay, Sydor remarked in the Unit words to the effect that he could not believe he was saying it, but he would have to pick his daughter being impregnated by a schmope (Black man) because having a gay son is the worst thing that could happen to a parent.  According to Sydor, it's every father's worst nightmare.

28.    The above list represents a small sample size of Sydor's gender-based comments, which occurred on a near daily basis throughout Boudouris' employment at the Unit and beyond.

29.    Additionally, throughout her field training, Sydor told deputies in the Unit that he did not believe a 45 year old female would want to work nights, or in housing projects, and that she would be unable to keep up such a fast pace.

30.    Boudouris discussed the difficult working conditions with other co-workers, but they warned her not to complain, especially during her probationary period.

31.    On or about March 1, 2011, Boudouris was assigned to work one on one with Sydor. Boudouris complained to Cafiero that she was generally uncomfortable with Cafiero and Sydor's comments in the Unit, and that she did not want to work one on one with him.

32.    Cafiero responded by saying that "the guys" enjoy his banter, but he would try to control his language and would also speak to Sydor. However, Cafiero warned Boudouris that she was on probation and that complaining was not the best way to "make friends with the guys." He also claimed that no one ever reported a problem with this before.

33.    Shortly after her complaint, Sydor commented about a female clerk, Pat June, stating, "that cunt needs to retire or drop dead," "it's selfish cunts like her that take jobs away from younger people," and "my wife can't even get a county job because cunts like Pat June won't retire." These comments were made in front of Cafiero and Boudouris in the Unit.

34.     Upon hearing Sydor's comments, Boudouris approached Cafiero to complain. As she approached, Cafiero sarcastically said words to the effect of, "Oh, by the way, I hope no one in this room is offended," a comment directed at Boudouris, coming on the heels of her complaint.

35.     Sydor added words to the effect of, "If anyone is offended, maybe they're in the wrong job and should quit."

36.     In July 2011, Boudouris completed her probation period.

37.     Sydor although not a supervisor at the time, acted like one, and had the squad execute warrants in the worst neighborhoods outside the jurisdiction, in Queens and Brooklyn. Other deputies told Boudouris that Sydor was doing this to discourage Boudouris from continuing this employment.

38.     In September 2011, Boudouris' father passed away.

39.     Many of her co-workers attended the wake, including Cafiero. At the wake, Cafiero falsely told the other deputies that Boudouris and Deputy Goropeuschek were "sleeping together."

40.     On November 21, 2011, Cafiero, in reference to a female police officer who had been involved in a car accident during a police chase, stated "you see these stupid cunts think

they can drive. She probably just had her nails done and wasn't even gripping the steering wheel properly." He repeated comments like this, referring to this specific incident, for a week or two.

41.     One night in January 2012, while Cafiero was performing the "Lou Show," Cafiero said that Deputy Stemmle (a female, who they commonly referred to as "Stemmle-lazy"), was in "one of her pissy moods" and that "it's like she's on the rag times ten." Sydor added, "Exactly! That's why women don't belong in certain professions."

42.     In February 2012, Boudouris went to Cafiero's office to get equipment. While in the office, Cafiero asked Boudouris if Deputy Stemmle was dating Deputy Rockwood. She said she did not know and that it was none of her business. Cafiero said he did not care either, but he was trying to figure out whether "she played for the other team or not," meaning whether she was a lesbian. He said, "the jury is still out on that one." Discussions about Stemmle's sexual orientation were a regular occurrence.

43.     In March 2012, Boudouris learned from co-workers that Cafiero and Sydor had been referring to her as "*Boob*douris" for months.

44.     Shortly thereafter, Sydor confronted Boudouris and told her that he knows she heard about what he had been saying, but he would deny ever saying *Boob*douris and that if she filed a complaint, he would make a complaint against her.

45.     At our around the same time, Cafiero approached Boudouris and said that he knew she was aware of him calling her "*Boob*douris".

46.     At first, Cafiero tried to say that he thought it was her name.  When he realized Boudouris did not believe him, he argued that "Boob" could also refer to someone unintelligent.

47.     Boudouris began to leave given the absurd excuses.  Cafiero then admitted that he had used the gender-based name, but encouraged Boudouris not to complain.  He told her that he had been on the job for a long time and he forgot how to use his filter.  He added that his wife was unable to work, he had five kids, and he was about to lose his house.  Boudouris said that she did not want to hurt anyone's family, but she has endured this for a long time, would not deal with it any longer, and was going to complain to Captain Schnurr.

48.     Later that evening, Boudouris again approached Cafiero and told him that she was trying to be a good officer and hoped that her co-workers and supervisors noticed such and would respect her.  Cafiero said that "the guys don't know what to make of [you] yet."

49.     During the conversation, Cafiero further stated that even if Boudouris complained to the Captain, the Captain would do nothing and suggested that the Captain would then join in the conduct and talk behind her back.

50.     Before she had the opportunity to complain to the Captain, co-worker Deputy Feiola called Boudouris and her husband at home to tell them that during a conversation

Lieutenant Cafiero yelled at Feiola, "you're trying to bang Boudouris." Because Boudouris' husband also worked for the Department and might hear the rumors, Feiola wanted to assure them both that the rumors were false.

51.     Shortly thereafter, Boudouris complained to Captain Schnurr about the harassment. She told him about: (1) being called *Boob*douris, (2) the "banging Boudouris" incident; (3) the incident at the wake; (4) the offensive gender-based comments in the workplace; and (5) the multiple complaints to Cafiero and Sydor, but they would not relent.

52.     Schnurr claimed that he did not previously know about the "*Boob*douris" incidents. He did not deny knowing about the other incidents. His knowledge may be inferred by his failure to deny, as well as the extensive and widespread[3] expression of gender-based comments, and other deputies told Boudouris that Captain Schnurr knew about the incidents.

53.     Schnurr said he would handle the situation, but said he cannot control what happens when he is not there. He asked if she wanted to be placed on a tour opposite from Sydor and Cafiero, but noted that a problem would arise should Stemmle (a female) not also agree to a change of tour (i.e., Stemmle would have to agree to a tour change – be placed with Cafiero and Sydor – for Boudouris to be switched out). Boudouris said she would welcome working with another squad, but that would not solve the problem and the conduct had to stop. Schnurr said he would work on the issue.

---

[3] Deputies from the Mineola location would frequently work overtime shifts at the Family Court Unit. They would see the "Lou Show" first hand. Boudouris spoke to many of these deputies who told Boudouris that they saw the "Lou Show" and that she probably would not be able to stop it from happening.

54.     Thereafter, on one particularly stormy day in April 2012, Boudouris was assigned a job which required that she work outside the office.  Boudouris remembered that she left her department raincoat in the back of the vehicle to which she was assigned the night before, but Sydor and Toscano had taken that vehicle for the day.

55.     Cafiero called Sydor and asked that he look for the coat, but Sydor claimed he could not find it.

56.     Accordingly, Boudouris worked outside in the torrential rains for the day.

57.     At the end of the shift, Sydor returned to the Unit holding Boudouris' coat while smirking.

58.     On June 18, 2012, Boudouris and her partner, Deputy Keith Helmke, were serving a warrant.  Upon encountering the suspect, he drew a knife.  Boudouris went "over the air" (used her radio) requesting police assistance.  Boudouris and her partner eventually apprehended the suspect and assistance arrived thereafter.  Upon their return to the Unit, most of the deputies were discussing where they were when the call went "over the air."  One officer noticed how quiet Sydor was and asked him, "Where were you?"  Sydor responded, "I was in the bathroom."  Sydor previously told Boudouris that if another deputy whom Sydor did not like, then-Deputy Ferrara, called for help, Sydor would claim that he was in the bathroom and would not have heard the call and, therefore, would not respond.

59.     At the end of July 2012, Boudouris and her husband met with the Nassau County Executive regarding an unrelated matter.  At the end of the meeting, the County Executive asked how Boudouris' work was going.  Boudouris relayed, generally, that she was dealing with sexual harassment.  The County Executive suggested that she file a complaint.  Thereafter, Boudouris continued efforts to informally resolve the matter within the chain of command.

60.     On or about September 7, 2012, Deputy Sydor was promoted to Sergeant.

61.     At or about that time, Schnurr was promoted to Deputy Undersheriff – one of the highest positions in the Department.   The Deputy Undersheriff reports directly to the Undersheriff who reports to the Sheriff.  As Deputy Undersheriff, he has policy making authority with regard to many personnel matters, and was responsible for ensuring a workplace free from harassment or discrimination.  Schnurr's office remained in the Unit even after his promotion.

62.     On September 27, 2012, Boudouris suffered a minor laceration on her thumb.

63.     Shortly thereafter, upon return from her injury, a deputy joked, in good nature, that Boudouris had a "Honey Boo Boo"[4] injury.

64.     Sometime in October 2012, Boudouris entered Cafiero's office to check the shift assignments and Honey Boo Boo was on the television.

---

[4] Honey Boo Boo is a reference to a reality television show about a child beauty pageant contestant.

65.     Cafiero asked Boudouris if she watched the show "with the rednecks."  She said no, and he asked, "Really?  You don't watch Honey *Boobs*?"  Boudouris replied, "The show is called Honey Boo Boo," and she continued reading the shift assignments while Cafiero repeated "honey *boobs*" a number of times.

66.     Boudouris glared at Cafiero in disapproval and Cafiero said, "Sorry, but look at what I look at all day, Derner doesn't wash her hair and if Stemmle's ass gets any wider, she won't fit through the door."  He also noted that before his wife had children, his wife had a body like that of Boudouris.

67.     In November 2012, Cafiero and Sydor were looking at pictures of Deputy Pratt and his wife on Facebook or some other social media site.  His wife's name is "Anne-Marie," but behind Pratt's back, Cafiero and Sydor commonly call her "*Man*-Marie."  While viewing pictures of Pratt and his wife, Cafiero said that Pratt "has nicer tits than Man-Marie."

68.     Throughout her time in the Unit, Cafiero and Sydor would commonly look at Facebook and/or other internet sites.  They would often make derogatory gender-based comments about women they viewed.

69.     Also, in November 2012, Sergeant Sydor assigned Boudouris to help him carry boxes to the office, which involved traversing a number of flights of stairs, and it was raining so some of the stairs were wet.  Sydor took two cases stacked, while Boudouris said she was going to carry one box at a time.  Sydor threw the keys on the tailgate of the truck and sarcastically

said, "you wanted equality, so do it your way and lock up the truck when you are done."  Upon her return with the first box, although unnecessary because Boudouris was capable of returning to get the other box, another deputy kindly offered to get the second box for her.

70.     In February 2013, during the "Lou Show," Cafiero said that his wife wanted permission to have one night with Brad Pitt or Johnny Depp.  Cafiero said that celebrities do not "do anything for him," and he would be happy to "pork" any woman.

71.     Also in February 2013, Boudouris returned at the end of a shift working out of the office and changed in the locker room.  She came out wearing the black tee shirt that most of the deputies wear under the uniform.  As Boudouris walked to her desk, Cafiero asked "Did you leave your headlights on?"  This was a reference to her nipples.

72.     In late April 2013, Boudouris was about to enter Cafiero's office when she heard him talking to other deputies: "To tell you the truth, I think Boudouris probably does the Brazilian thing.[5]  What do you think?"  He continued, "I don't know, she probably winds up like Derner in 10 years.[6]  Manny [Boudouris' husband] will be breaking through cobwebs to gain access to her twat."

73.     Boudouris entered the office, confronted Cafiero, and said that she heard Cafiero talking about her and she would be reporting the incident to Deputy Undersheriff Schnurr.

---

[5] Referring to hair removal in the pubic area.

[6] See Paragraph 25(a).

74.     Cafiero warned Boudouris that Schnurr would not help her.  She said that if he did not help, she will find out who she needed to complain to.  Cafiero said that no one is afraid of her.

75.     Boudouris went to Schnurr, but he was not in his office.  Boudouris left for vacation the next day.

76.     On or about April 25, 2013, shortly after opposing Cafiero's discrimination and while Boudouris was on vacation in Florida, Lieutenant Sellito called Boudouris and told her that Cafiero reported to Deputy Undersheriff Schnurr that Boudouris falsified records to obtain two extra hours of compensation time, and Sellito had approved the time.  Sellito said that he was mad at Cafiero for reporting this to the Deputy Undersheriff because the error was Sellito's mistake and, typically, he and Cafiero would have resolved the issue amongst themselves.  Boudouris explained to Sellito that Cafiero did it in retaliation for her complaining about his sexual harassment and because she told him that she was going to report it.

77.     While still in Florida, Deputy Undersheriff Schnurr called Boudouris and told her that pursuant to a Sheriff's order, she was being transferred to the Field Unit in Mineola.  Boudouris was surprised and later called back to find out if she was the only one being transferred, and Schnurr said that she was the only one being moved.

78.     The Field Unit conducts a substantially different kind of work than the Family Court Unit.  The Family Court Unit regularly executes warrants, is called on to make arrests, and

takes people into custody. The Field Unit serves property executions and conducts Sheriff's sales, which does not involve arrests. Additionally, the work in the Family Court Unit is more diverse than the work performed in the Field Unit. The Field Unit handles substantially more paperwork than the Family Court Unit. Additionally, the Family Court Unit has substantial opportunities for overtime, while the Field Unit has no available overtime. This transfer was an adverse action as a reasonable person in Boudouris' position may be dissuaded from making or supporting a claim of discrimination if subjected to such a transfer (which caused a significant alteration of job responsibilities and income due to loss of overtime opportunities) because of the claim.

79.     Although Boudouris is grateful to work with people who are not regularly making gender-based comments, a transfer should not have been necessary to achieve that result. Rather, County supervisors and policymakers who were aware of the discrimination should have acted decisively with respect to the actors. Moreover, given that law enforcement is a male-dominated profession and the County has had numerous prior sexual harassment incidents, including substantial jury verdicts against law enforcement agencies, policymakers should have ensured meaningful training and adequate supervision, but were deliberately indifferent to this need.

80.     On or about May 6, 2013, upon the end of her vacation, Boudouris reported to the Field Unit.

81.     On her arrival, she was told that someone from the Field Unit (Dennis O'Brien) was involuntarily transferred from the Field Unit to the Family Court Unit to make room for Boudouris.  Sergeant Ferrara, her new direct supervisor, told her that no one previously had a problem with her, but that the people in the Field Unit were mad because O'Brien was forced to transfer out.

82.     Boudouris told the Union President (Lieutenant Robert Arciello) she felt bad that O'Brien had been transferred.  Lieutenant Arciello responded by telling her that her bigger issue is Family Court because the people there are furious with her and that the environment there was extremely hostile towards her.  He suggested that Boudouris stay away from the Family Court Unit.  Boudouris responded that she wanted to work overtime there, since Family Court tours are the only opportunity to earn overtime.  He told her that she could work overtime, but that he recommended she stay away from the Family Court Unit for as long as possible.

83.     Boudouris called the Family Court Unit and asked for overtime because she wanted to make it clear that she had an interest in overtime.  At that time, the overtime list consisted of all the Deputies in the Department, including the Field Unit, except Boudouris' name was inexplicably omitted.  After Boudouris made clear that she was interested in overtime, Deputy Feiola added her name to the list.  Deputy Feiola later called Boudouris and advised her that he was taking a lot of heat for putting her on the overtime list and said that all other officers (especially Lieutenant Cafiero) were saying that they should not put her on the list and pretend that they forgot to do so.

84.     Shortly thereafter, Cafiero called Boudouris and told her that if she was interested in overtime, she had to call every day and tell either Cafiero or Selitto that she was interested. This was not the procedure that had been used for other officers who did not complain about discrimination.

85.     Thereafter, Boudouris regularly called for overtime, but when overtime was available, she turned down the opportunity given the hostility and the warning given by Lieutenant Arciello, as well as the report from Deputy Fieola, and the fact that Cafiero changed the procedure. She had also heard other reports that she was hated in the Family Court Unit.

86.     On August 28, 2013, Boudouris felt that because some time had elapsed, she needed the extra money, and she knew that Cafiero and Sydor were not working that night, that it would be safe to do overtime at the Family Court Unit. Accordingly, she accepted the opportunity to work overtime there. That day, a deputy called her to tell her that most of the deputies in the Family Court Unit did not want to work with her and that no one would be there when she arrived. When she reported for work, no deputies were in the office. Lieutenant Sellito and Sergeant Dier were the only officers present.

87.     To prepare for her shift, Boudouris went to her locker and saw a heavy Plexiglas partition placed directly in front of her locker. Boudouris asked Schnurr if the partition was there for a purpose. Schnurr gave her permission to move it. Sellito and Mastropoalo overheard Schnurr's direction and laughed.

88.     Later that night, Lieutenant Sellito told Boudouris that she was to complete all of her assignments, no matter how late she had to stay.  Sergeant Dier then gave Boudouris her assignments and stated, "Here is your work for the night, just make sure you are back by 10:00 p.m., no later."  Boudouris asked for clarification because Sellito told her to stay as late as needed, which conflicted with Dier's instruction.  Dier said, "I am telling you come back by 10."  Overhearing the conversation, Sellito came out of his office and said to Boudouris, "What's your problem?"  Boudouris said she would do whatever asked, but the two had given conflicting orders and she just wanted to do the right thing.  Sergeant Dier said, "Do what the Lieutenant said, if he said don't come back until it's done, don't come back until it's done."  Boudouris' partner for the night, Deputy Triano, remarked that Sellito and Dier were treating her "shitty."

89.     On August 29, 2013, the very next day, Cafiero questioned Boudouris about a temporary order of protection that she was to have served the night before.  However, the person to be served was inside a dwelling and the answering occupant told Boudouris she was not permitted to enter without a warrant.  Given that there were no exigent circumstances, and Boudouris was unsure whether the person to be served was therein, she was unable to serve the order of protection at that time.  Cafiero said that she had done the work wrong, and that she should have called for backup and made entry.  He then stated that Boudouris never understood how things worked in the Family Court Unit.  Boudouris called her direct superior at the time (Sergeant Ferrara) and Ferrara told her that she had done the right thing; she was not permitted to force entry as that would be unconstitutional.  Ferrara said that Cafiero was "messing" with her.

90.     As a result of the above, along with Sydor's clear reference that he would not help Boudouris in emergency situations (see supra at p. 14, ¶58), and the fact that her personal physical safety depended on cooperation from fellow deputies, Boudouris felt that the work conditions at the Family Court Unit were so unpleasant and unsafe that the situation was intolerable, such that she was constructively denied overtime opportunities.

91.     After O'Brien was transferred to the Family Court Unit, he filed a grievance through the union to return to the Field Unit.  Approximately a year after the transfer, O'Brien won his grievance and was to be transferred back to the Field Unit.

92.     On June 23, 2014, Chief Fitzpatrick called Boudouris and told her that, per orders from Sheriff Sposato, she was to report back to the Family Court Unit the next day.  Boudouris told Chief Fitzpatrick that she could not go back there because she was sexually harassed and discriminated against at the Family Court Unit.  In response, instead of allowing the transfer and providing assurances that she would not be subject to sexual harassment or retaliation, the Chief gave her an extra day to see if she could avoid the transfer.  He suggested that she submit two writings: (1) one requesting an urgent meeting with the Sheriff; and (2) another that outlined her concerns about being returned to the Family Court Unit, which should be submitted to Boudouris' Sergeant who would relay it up the chain of command.

93.     Before doing either, Boudouris spoke briefly with County Executive Edward Mangano and told him generally about the situation.  Mangano indicated that she could either follow the protocol suggested by the Chief or contact the Union, and she should file a complaint.

23

94.     Boudouris called her Union President, Lieutenant Arciello, and discussed the sexual harassment that took place at the Family Court Unit. Arciello explained that it sounded like an EEO matter, but, because Arciello was not on duty, he directed Boudouris to call Bob Campo, another union representative. Campo confirmed Arciello's conclusion that it was an EEO matter. Campo told Boudouris that he did not have the information about who to contact, but that he would have such information for her by the next day and that she should call then if she wanted.

95.     Thereafter, Boudouris emailed the Chief to request an urgent meeting with the Sheriff. Boudouris also emailed the Sheriff's secretary to confirm an earlier conversation with the secretary requesting the same.

96.     On June 24, 2014, Boudouris submitted a memo dated June 23, 2014 to Sergeant Christopher Ferrara, copied to Captain Anthony LaRocco, Chief Jerome Fitzpatrick, Deputy Undersheriff Lawrence Schnurr, Undersheriff TJ Smith, and Sheriff Michael Sposato. The memo specifically advised all that "[a]lthough many incidents of Sexual Harassment and Hostile Working Environment conditions were documented with certain Officers in my Chain of Command, these offenses not only continued, but included these Ranking Officers."

97.     Although this memo was sent to the entire chain of command, no investigation occurred, nor was anyone given any sexual harassment training at that time, thereby evidencing the deliberate indifference of the entire command to the violation of Boudouris' constitutional and statutory rights, or the rights of other women to be free from sexual harassment.

98.     Shortly after sending the memo, Boudouris received a text message from the Sheriff.  The Sheriff asked Boudouris to call him when she had the opportunity.

99.     Given Arciello and Campo's suggestion that it may be an EEO matter, Boudouris was confused about how the complaint should proceed and called Arciello.  Arciello made two suggestions: Boudouris could either file an EEO complaint or continue following the chain of command (which Arciello suggested was the better route).  Boudouris said she would follow the chain of command and, in response, Arciello told Boudouris to request a sit down between Boudouris, Arciello, and the Sheriff.

100.    Thereafter, Boudouris spoke directly with Sheriff Sposato by phone and told him that she was subjected to sexually harassing and discriminatory treatment at the Family Court Unit, and she did not want to return.  As per Lieutenant Arciello's suggestion, Boudouris suggested a "sit down" with her and Arciello, but the Sheriff abruptly replied that he does not do "sit downs" with union officials.  The Sheriff stated that he "knew what to do" about the situation and would call her back.

101.    Given that Boudouris' transfer back to the Family Court Unit involved a tour change (i.e., change in shift hours), she had a contractual right to request an additional two-weeks before the transfer would take effect.  Per the Chief, the deadline for such request was to end on June 24, 2014, at 3:00 p.m. that day.

102.     Because the Sheriff had not called her back, Boudouris texted Sheriff Sposato at 1:26 p.m., requesting that he call her back by 3:00 p.m. because her two-week request was due at that time.   However, the Sheriff did not respond to Boudouris' text message by such time. Accordingly, she submitted the extension paperwork to Chief Fitzpatrick.

103.     Shortly thereafter, Arciello called Boudouris and told her that the Sheriff had called him and indicated that he wants "nothing to do with this."   According to Arciello, the Sheriff sounded annoyed and told Arciello to tell Boudouris to "file whatever [she] wants, [he] has nothing to discuss with [Boudouris]."

104.     On June 25, 2014, Arciello told Boudouris that because Sheriff Sposato was not amenable to an informal "sit down," and from what Boudouris explained earlier, her complaint was of sexual harassment and discrimination and such issues were an EEO matter, she should contact Antonio Patino, an affirmative action specialist, and Mary Elizabeth Osterman, the County Director of Equal Employment Opportunity.

105.     This was the first time during her employment or after her complaint of discrimination that Boudouris recalls being told of the existence of an affirmative action specialist, the Director of EEO, or any person within the Department designated to handle such complaints.

106.     Boudouris called Osterman, and explained the situation.   Osterman asked why Boudouris did not file a complaint when the alleged sexual harassment/discrimination occurred.

107.    Among other things, Boudouris stated that she attempted to resolve the issue within the chain of command.  Moreover, Boudouris explained that she was going to complain, but was transferred before doing so, and was worried about further retaliation that might stem from a formal complaint.  She also mentioned that she did not know how to file an EEO complaint.  Osterman then referred Boudouris to Patino to make a formal EEO complaint.

108.    On June 26, 2014, Boudouris met with Patino and Corporal Chris Contreras and completed an EEO complaint, naming Cafiero and Sydor as the respondents.

109.    Later that day, Fitzpatrick told Boudouris that Arciello told Cafiero that Boudouris was filing the complaint, after which, Cafiero jokingly announced to the Family Court Unit that he was retiring.

110.    On July 1, 2014, Boudouris submitted a report to Patino outlining the conduct.

111.    On July 8, 2014, at the request of Osterman, Boudouris delivered copies of logs and additional incident reports that detailed the conduct.

112.    On July 10, 2014, Boudouris met with Osterman and detailed further instances of discrimination, many of which are detailed above.

113.    Boudouris also informed Osterman about Sydor's discriminatory animus towards other protected classes.  For instance, Sydor commonly called Black people "schmope," Indian people "sand/dot head," Jewish people "kike," and that Sydor repeatedly used the term "GAS," a term that later Sydor claimed he coined and meant "greasy ass spic."  Sydor regularly used all of these terms at the Family Court Unit.

114.    Boudouris also told Ostermann that she was concerned about being ordered to report back to the Family Court Unit.  Ostermann said she would reach out to Sheriff Sposato about such concern.

115.    On July 11, 2014, Ostermann emailed Boudouris that, per Ostermann's conversation with Sheriff Sposato, "pending the investigation of [Boudouris'] EEO complaint" she was to remain at the Field Unit.  Ostermann further stated that there would be a written statement regarding the outcome of the investigation, and at such time that the statement is released, her temporary assignment to the Field Unit would be reviewed.

116.    The County EEO handbook states that investigations must be completed within 60 days from the filing of a complaint.  Despite Boudouris' complaint being filed on June 26, 2014, there has been no conclusion.

117.    This delay is unreasonable and is likely to discourage someone from making a complaint.  Further, EEO investigators Ostermann and Patino, asked numerous questions (often leading and assuming facts that were not true) that were irrelevant, or seemed designed to present

the situation as if Boudouris had engaged in wrongdoing, or in a manner so as to evidence that the EEO investigation was designed to protect the County instead of conducting a legitimate, neutral investigation.

118.    As examples, the EEO investigators: (1) repeatedly asked Boudouris about her political affiliations with the County Executive (e.g., Boudouris was asked whether she had done a fundraiser for the County Executive); (2) characterized her involuntary transfer to the Field Unit as a "promotion," which it was not; and (3) asked Boudouris whether she went to "happy hour" or nearby bars with co-workers, not accepting her negative answer and, instead, repeatedly asking her about it.

119.    This belief was further bolstered by the fact that Osterman told Boudouris that if Boudouris was represented by counsel, Osterman would not be able to speak directly with Boudouris and would have to go through the attorney. This would be true only if Osterman was representing the County.

120.    Shortly after Boudouris filed her EEO complaint, Boudouris and the County Executive were at a Bethpage Republican Club breakfast. Boudouris had a brief moment with the County Executive and told him that she had filed the EEO complaint, and whether she would be able to say that she spoke with him previously about the sexual harassment. The County Executive said that she should not and that he could not speak with her further because it was "now a legal investigation."

121.    In summer 2014, Deputy Feiola told Boudouris that there was a rumor that she may be coming back to Family Court.  He added, that he would work with her, implying that others would not, and specifically telling her that nothing has changed at the Family Court Unit – meaning the "Lou Show" and the other conduct continued.


122.    On August 26, 2014, given that 60 days had elapsed since her EEO filing, Boudouris followed up with Patino regarding the status of the investigation.  Patino said that EEO had conducted four interviews, two of which were with Cafiero and Sydor.  Patino further stated that sexual harassment training had been given and his findings would be submitted to Ostermann shortly.  Boudouris told Patino that two of the interviewees were the respondents and, if they had not admitted to the allegations, she was concerned about whether EEO would conduct further interviews.  Patino appeared confused and said words to the effect of "Who are the respondents?"  Boudouris told Patino that it was Sydor and Cafiero.  In response to Boudouris' question of whether further interviews would be conducted, Patino responded that he could not discuss the specifics of the investigation.


123.    Boudouris was concerned about this conversation and called Ostermann.  Boudouris inquired as to the progress of the investigation and Ostermann hastily told her that she was not to ask about the status of the case, and that Boudouris was to wait to hear from Ostermann.


124.    On September 17, 2014, during a follow-up interview with Ostermann and Patino, Ostermann told Boudouris that the investigation was nearly complete.

125.    On October 2, 2014, Deputy Triano informed Boudouris that Sergeant Sydor showed him a photo on his cell phone that showed Boudouris at a Mineola coffee shop taking her meal time out of schedule.  The purpose of this picture was to try to prove that Boudouris was engaged in inappropriate conduct and discredit and/or discipline her.

126.    On October 3, 2014, Boudouris was discussing a case with Captain LaRocco. Chief Fitzpatrick walked into the room and asked Boudouris if she had told the Captain about "Dan [Sydor's] latest stupidity."  Boudouris responded in the negative and the Chief responded, "of course, Triano had to rat [Sydor] out."  Captain LaRocco told the Chief that there was an investigation pending and Sydor should not be acting this way.  The Captain said Sydor is playing with fire and they needed to sit him down to have a good talk with him.  The Chief responded that he would rather pretend he did not know anything about it.

127.    In October 2014, Deputy Feiola told Boudouris that one day, while he was in the Main Area of the Family Court Unit, Boudouris went "over the air" (meaning on her police radio), and when people in the Unit heard her voice, Mastropaolo (a clerk) said that she was a "cunt" and Sydor claimed to correct her by calling Boudouris a "stupid cunt."  Feiola also advised Boudouris that he was forthcoming when interviewed by EEO and that he retired, in part, because he felt he was being retaliated against for supporting her claims.

128.    On October 30, 2014, in direct violation of the Sheriff's earlier direction that Boudouris was to remain at the Field Unit until her EEO complaint had resulted in a final report,

the Sheriff ordered Boudouris to report immediately to the Family Court Unit for an arrest process on a female fugitive. Boudouris was uncomfortable with this order, but dutifully followed it. Upon her arrival at the Family Court Unit, Warrant Squad Sergeant Patton said, "Sorry, I have nothing to do with this." Patton then directed Boudouris to report to Lieutenant Cafiero. Sheriff Sposato was at the Family Court Unit as well.

129.    Cafiero ordered Boudouris to follow him to the men's locker room and to close the door; the two were alone.[7] Cafiero stood close to Boudouris and said that he did not want the Sheriff to hear. Cafiero said that the orders for Boudouris to report to the Family Court Unit came "directly from the Sheriff," and that Boudouris should be prepared for similar orders in the future. Boudouris felt extremely uncomfortable, intimidated, and sick to her stomach by the experience.

130.    Throughout her employment, the only discrimination or harassment training ever provided to Boudouris was at the Academy (June 2010-Jan. 2011) where four small slides (out of approximately fifty-nine) in a PowerPoint presentation briefly addressed sexual harassment and discrimination without providing reasonable detail or any description of how to report the same. Other than that, to Boudouris' knowledge, the Department did not again provide her with sexual harassment or anti-discrimination training. She was never trained on how to report sexual harassment or discrimination in the workplace.

---

[7] This is the same manner in which Cafiero previously confronted Boudouris about Cafiero's use of the gender-based term "*Boob*douris."

131.    Upon information and belief, other Department employees also received no or limited training.  After she filed her EEO complaint, Boudouris was told that training via an internet test was provided.


132.    Given the extent of the discrimination and harassment to which Boudouris was subjected, as well as the supervisors' failure to correct same, and the fact that law enforcement is a male-dominated profession and the County's law enforcement agencies have previously been accused of and found liable for similar sexual harassment, any training to prevent such discrimination was entirely insufficient and the Department was deliberately indifferent to the need for such training.


133.    Moreover, the fact that EEO and the entire command is aware of the situation and has not remedied the overtime issues, disciplined the personnel involved, and permitted the discriminatory treatment to continue well after Boudouris filed a formal complaint, further evidences the deliberate indifference and gross negligence in supervision.


134.    Although the people in her current unit treat her well, she continues to be fearful of returning to the Family Court Unit and has not worked overtime since August 28, 2013 – a situation of which she advised the EEO investigators, but remains un-remedied.

## CLAIMS FOR RELIEF

### FIRST CLAIM

(Sex/Gender Hostile Work Environment –
Fourteenth Amendment as enforced by 42 U.S.C. § 1983)

135.     Defendants, Cafiero and Sydor, under color of state law, altered Plaintiff's terms, conditions and privileges of employment because of her gender, in violation of the Fourteenth Amendment of the United States Constitution (as enforced by 42 U.S.C. § 1983) by subjecting her to a gender charged and unwelcome hostile work environment.


136.     Plaintiff was subjected to a practice and policy of discrimination, of a similar nature by the same individuals, thereby delaying the commencement of the statute of limitations to the last documented incident in furtherance of the hostile work environment which occurred in October 2014.


137.     Defendants, Sheriff Sposato and Undersheriff Schnurr, after being informed of the violation, failed to remedy the wrong and exhibited gross negligence in supervising subordinates and deliberate indifference to Plaintiff's rights, and created a policy or custom under which the unconstitutional practices occurred and/or allowed the continuance of such policy or custom.  As supervisors, Sposato and Schnurr knew and/or should have known of the conduct set forth above and failed to take adequate remedial steps to correct or prevent the behavior.


138.     Defendant, the County, is subject to <u>Monell</u> liability because the County's maintained a policy, practice or custom, whereby it committed, condoned, and/or remained deliberately indifferent to sexual harassment, which may be inferred in the following ways:

34

a. Defendants' maintained a custom or practice of discriminating against Plaintiff based on her sex/gender. The discriminatory practices were so persistent and widespread that they constitute actual and/or constructive acquiescence of policymakers.

b. The County's high-level supervisors and/or persons responsible for preventing gender discrimination failed to properly investigate, prevent, remedy, or correct the unlawful conduct.

c. Inadequate training/supervision was so likely to result in discrimination that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

d. Policymakers knew of and failed to correct the unlawful conduct.

## SECOND CLAIM

(Sex/Gender Hostile Work Environment – New York State Human Rights Law)

139.    Defendants, Cafiero and Sydor, aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law § 296(6) by actually participating in the discriminatory conduct, including the hostile work environment.

140.    Defendants, Sheriff Sposato and Undersheriff Schnurr, aided, abetted, incited, compelled and/or condoned the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law §296(6).

141.    Further, the Sheriff Sposato and any other individual defendant who made personnel decisions affecting Plaintiff are liable as employers under New York State Executive Law, Human Rights Law §296(6).

## THIRD CLAIM

(Retaliation – New York State Human Rights Law)

142.    After her complaints and/or opposition to unlawful discrimination, the individual Defendants subjected Plaintiff to adverse actions and/or condoned such acts, including: (a) involuntary transfer, (b) constructive denial of overtime; (c) a hostile work environment; (d) reassignment to the Family Court Unit; (e) an unreasonably slow and seemingly biased investigation; (f) requiring Plaintiff to report to one of her harassers, Cafiero; (g) the threat of being reassigned to the Family Court Unit; (h) the fabrication and/or intentional efforts to obtain evidence to either discipline and/or threaten to discipline Plaintiff, (i) an atmosphere of adverse actions, and/or (j) any other act that would dissuade a reasonable employee from making or maintaining a complaint of discrimination.

143.    The individual Defendants aided, abetted, incited, compelled and/or condoned the aforementioned retaliatory conduct in violation of New York State Executive Law, Human Rights Law §296(6).

144.    Further, the Sheriff Sposato and any other individuals who made personnel decisions affecting Plaintiff are liable as employers under New York State Executive Law, Human Rights Law §296(6).

WHEREFORE, Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Carle Place, New York
      November 13, 2014

                                  LEEDS BROWN LAW, P.C.

                                    *Attorneys for Plaintiff*
                                    One Old Country Road, Ste. 347
                                    Carle Place, New York 11514
                                    (516) 873-9550

                                    RICK OSTROVE